UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

GEORGE EDWARD M., III,[1]

      **Plaintiff,**

    v.                                 **Civil Action 2:21-cv-4073**
                                          **Magistrate Judge Chelsey M. Vascura**

COMMISSIONER OF SOCIAL
SECURITY,

      **Defendant.**

## OPINION AND ORDER

Plaintiff, George Edward M., III ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") and disability insurance benefits ("DIB").  The parties have consented to jurisdiction pursuant to 28 U.S.C. § 636(c).  (ECF Nos. 6, 7.)  This matter is before the Court on Plaintiff's Statement of Errors (ECF No. 13), the Commissioner's Memorandum in Opposition (ECF No. 14), Plaintiff's Reply (ECF No. 15), and the administrative record (ECF No. 8).  For the reasons that follow, Plaintiff's Statement of Errors is **OVERRULED**, and the Commissioner's decision is **AFFIRMED**.

## I.      BACKGROUND

Plaintiff protectively filed applications for SSI and DIB on June 16, 2019, alleging that he became disabled on April 5, 2011, and later amended his alleged onset date to December 14, 2017.  (R. at 221–22, 223–30, 312.)  Plaintiff's applications were denied initially in August

---

[1] Pursuant to this Court's General Order 22–01, claimants in Social Security matters are referred to by first name and last initial.

2019, and upon reconsideration in January 2020.  (R. at 135–37, 138–40, 146–52, 153–57.)

Administrative Law Judge Deborah Giesen ("the ALJ") held a hearing on October 26, 2020 (R.

at 45–84), before issuing an unfavorable disability determination on November 30, 2020 (R. at

22–44).  The Appeals Council subsequently denied Plaintiff's request for review, making the

ALJ's determination final for purposes of judicial review.  (R. at 1–6.)

Plaintiff asserts that the following two errors require remand: (1) the ALJ erred when

analyzing if his impairments met or were medically equal in severity to Listing 1.04; and (2) the

ALJ erred when analyzing opinion evidence.  (ECF No. 13, PageID # 6942–50).  The Court finds

that Plaintiff's contentions of error lack merit.

## II.      THE ALJ'S DECISION

On November 30, 2020, the ALJ issued her determination finding that Plaintiff was not

disabled within the meaning of the Social Security Act.  (R. at 22–44.)  At step one of the

sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.     Is the claimant engaged in substantial gainful activity?
2.     Does the claimant suffer from one or more severe impairments?
3.     Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.     Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.     Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

gainful activity since December 14, 2017, his amended date of onset.  (R. at 27.)  At step two, the ALJ found that Plaintiff had the following severe impairments: osteoarthritis of the left ankle post multiple surgeries for osteosarcoma of the fibula; cellulitis; obesity, and degenerative disc disease of the lumbar spine.  (R. at 28.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)  Before proceeding to step four, the ALJ set forth Plaintiff's residual functional capacity ("RFC")[3] as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a).  He is limited to occasional climbing ramps and stairs and balancing, frequent stooping, and no kneeling, crouching or crawling.  He is limited to no operation of foot controls.  He is limited to no climbing ladders, ropes, or scaffolds.  He is limited to no working around unprotected heights, open flames, or unprotected dangerous machinery.  He should be allowed use of a cane/assistive device for walking.

(R. at 30–31.)

The ALJ then relied on testimony from a vocational expert ("VE") to conclude at steps four and five that Plaintiff was unable to perform his past relevant work but given his age, education, work experience, and RFC, he was capable of making a successful adjustment to other work that existed in significant numbers in the national economy.  (R. at 36–37.)  The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act since December 14, 2017, through the decision date of November 30, 2020.  (R. at 37.)

---

[3] A claimant's RFC represents the most that a claimant can do despite his or her limitations. 20 U.S.C. § 404.1545(a)(1).

### III.    RELEVANT RECORD EVIDENCE

#### A.  Medical Records

The record reflects that Plaintiff underwent surgery in 2011, prior to his alleged date of onset, for osteosarcoma of the left fibula.  (R. at 541.)  He suffered a post-operative wound infection that required treatment, including hospitalization.  (*Id*.)  Skin was taken from Plaintiff's left arm and grafted onto his left lower leg.  (R. at 1133.)  It appears that Plaintiff received disability benefits for approximately three-and-a-half years after his osteosarcoma surgery, and that those benefits ended in 2014.  (R. at 56.)  Plaintiff returned to work in 2015 doing flooring. (R. at 56–57.)

On December 14, 2017, Plaintiff's alleged date of onset, Plaintiff sought treatment for pain in his left ankle.  (*Id*.)  He reported that his pain was debilitating and that his ankle swelled intermittently.  (*Id*.)  An examination showed that he ambulated with a limp and that his left knee locked with stepping.  (R. at 543.)  Plaintiff was prescribed physical therapy ("PT") "again." (*Id*.)  The record indicates that Plaintiff had poor general compliance with PT at that time (R. at 594), but it was noted that he demonstrated good progress towards his goals (R. at 594, 605.) Plaintiff was discharged from PT for noncompliance, but he was referred by his physician back to PT on March 15, 2018.  (R. at 631.)  At PT sessions thereafter, it was noted that he demonstrated fair (R. at 650, 699, 712, 731, 739, 768, 782, 796, 823, ) or good progress towards his goals (R. at 662, 673, 810, 835).  Plaintiff reported to one of his providers that he was done with PT in June 2018.  (R. at 847.)

During an examination on June 8, 2018, Plaintiff reported a history of ankle pain that moderately limited his activity.  (R. at 1058.)  He reported swelling in his left ankle and struggling to walk.  (*Id*.)  An examination that day, however, revealed no clubbing or edema in Plaintiff's extremities and that his deep tendon reflexes and sensation were intact.  (*Id*.)  He also

had normal motor strength in all his limbs. (*Id*.) Examinations during the remainder of 2018 and early 2019 generally reflected that Plaintiff had no swelling or erythema (R. a 853, 878, 892, 906, 921, 938) or no edema (R. at 1056, 1051) in his left ankle or lower extremities. Likewise, providers noted in 2018 that Plaintiff's motor strength was normal in all limbs. (R. at 1056, 1052.)

In March 2019, an X-ray of Plaintiff's leg revealed no acute abnormalities but showed a small focal area of periosteal new bone at the proximal posterior fibula which might have been a healing stress fracture. (R. at 1036.) An MRI on March 26, 2019, however, showed no stress fracture or recurrence of Plaintiff's osteosarcoma. (R. at 1193.) X-rays of Plaintiff's left foot on April 22, 2019, showed no acute abnormalities, but he had arthritic changes in the subtalar joint. (R. at 1117, 1191–92.) A May 6, 2019 MRI of Plaintiff's left ankle showed significant subtalar arthritis of the left ankle. (R. at 1112–13, 1105.) Plaintiff was advised to get a steroid injection and a brace, and it was noted that he would eventually need an ankle fusion. (R. at 1106.) It appears that Plaintiff also began treating at a pain management clinic in March 2019 for his chronic ankle pain. (R. at 1175.)

In May 2019, Plaintiff had a steroid injection in his left ankle. (R. at 1095, 1189–90, 1304.) Plaintiff also underwent a functional capacity evaluation that month. The physical therapist who conducted the evaluation wrote that Plaintiff had a number of lift and carry restrictions and that Plaintiff could never crouch; rarely use stairs or walk; occasionally forward bend, stand, or kneel; and frequently sit or do elevated work. (R. at 1082–83.)

On July 28, 2019, Plaintiff sought treatment from the emergency room because he had developed redness and draining from the area on his left leg where he had previously received his skin graft. (R. at 1241.) An examination revealed a small area of erythema along the edge of

5

his skin graft and a small opening draining a small amount of serosanguineous material without fluctuance and pus.  (R. at 1244.)  The provider's impression was superficial cellulitis of the distal left calf.  (R. at 1246.)  Plaintiff was prescribed antibiotics and discharged.  (*Id.*)

Plaintiff subsequently sought treatment for continued drainage from his lower left leg from August 2019 through September 2019.  (R. at 1302, 1301, 1300.)  Initial testing revealed results that were suspicious for osteomyelitis (R. at 1185, 1228), but labs were interpreted as "not impressive for deep infection."  (R. at 1302.)  On October, 23, 2019, it was noted that Plaintiff's cellulitis had completely resolved; Plaintiff was doing well; and he had an essentially completely healed left later ankle wound.  (R. at 1299.)  Throughout this period, Plaintiff continued to treat with a pain management clinic for his chronic ankle pain.  (R. at 1169, 1205, 1202.)

On October 27, 2019, Plaintiff sought treatment from the emergency room for back pain in the lumbar region that radiated to his left buttock and down his left leg.  (R. a 1271.)  Upon examination, Plaintiff had diffuse pain over the left paralumbar area, his left buttock was tender to palpitation, and he had pain with straight leg raising on his left side.  (R. at 1273.)  Plaintiff subsequently reported to providers that he had intermittent back pain but that it was improved with prednisone.  (R. at 1684, 1679, 6697, 12, 7.)

During a November 4, 2019, follow up visit for his lower leg wound and cellulitis, a provider, Dr. Walla, examined Plaintiff and found a small area of scab along the lateral ankle; no erythema, palpable fluctuations, expressible drainage, or edema; Plaintiff's range of motion in his toes were intact; and that Plaintiff's sensation was intact to light touch.  (R. at 1298.)  An X-ray showed stable post-surgical changes in Plaintiff's left ankle and arthritic changes in the posterior subtalar joint.  (R. at 1292.)

6

That same day, another of Plaintiff's providers, Dr. Scharschmidt, wrote that he recommended that Plaintiff be evaluated by a foot and ankle team for consideration of subtalar fusion because Plaintiff had failed conservative management.  (R. at 1291.)  Dr. Scharschmidt noted that Plaintiff was continuing to work for long-term disability.  (*Id*.)  He also wrote that Plaintiff had been deemed unable to have any ambulatory or labor position and was having difficulty with sedentary or office position as well as he needed to elevate his foot every 2-3 hours given his chronic pain and swelling in the area.  (*Id*.)

Plaintiff continued to treat with a pain management clinic for his chronic ankle pain throughout 2019 and 2020.  (R. at 1684, 1679, 1674, 1669.)

In March of 2020, Plaintiff once again developed a wound with drainage on his lower left leg.  (R. at 1674.)  Plaintiff sought treatment for that wound until it was almost closed in September of 2020.  (R. at 1663, 1570, 1569, 1566, 1561, 6865, 6839, 6830, 6815, 6797, 6863, 6793, 6780, 6771, 6762, 6748, 6741, 6732, 6725, 6716, 6709, 6855, 6702.)

Plaintiff also treated with a pain management clinic for his chronic ankle pain in 2021. (R. at 12, 7.)

## B.  State Agency Reviewers

Plaintiff's file was reviewed by state agency reviewer, Yeshwanth Bekal, M.D., in August 2019.  (R. at 90–91, 99–100.)  Dr. Bekal found that Plaintiff was capable of a limited range of light work.  Specifically, Dr. Bekal found that Plaintiff could occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk for a total of four hours in an eight-hour workday; and sit for a total of six hours in an eight-hour workday.  (R. at 90, 99.)  Dr. Bekal further found that Plaintiff could never climb ladders, ropes, or scaffolds; occasionally climb ramps/stairs; and frequently balance, stoop, kneel, crouch, and crawl.  (R. at 90–91, 99–100.)

7

Dr. Bekal also found that Plaintiff should avoid all exposure to unprotected heights.  (R. at 91, 100.)  Plaintiff's file was reviewed at the reconsideration level by Gary Hinzman, M.D., who made the same findings.  (R. at 114–16, 128–30.)

## IV.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## V.    ANALYSIS

As previously noted, Plaintiff asserts that the ALJ erred by failing to determine if his impairments medically equaled Listing 1.04 and that she erred when analyzing opinion evidence. The Court addresses each contention of error and finds that both lack merit.

### A.    The ALJ did not err at step three.

Plaintiff contends that the ALJ committed reversible error because she failed to properly consider if Plaintiff's impairments medically equaled Listing 1.04.  (ECF No. 13, PageID # 6944–45.)  This contention of error is without merit.

At step three, an ALJ must compare a claimant's impairments to an enumerated list of medical conditions that the Social Security Administration has deemed "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. § 404.1525(a).  Each listing describes "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. § 404.1525(c)(3).  A claimant's impairment must meet every element of a listing before the Commissioner may conclude that he or she is disabled at step three of the sequential evaluation process.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.").  The claimant bears the burden of showing that his impairment meets or medically equals a listing at step three.  *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 414–15 (6th Cir. 2020).  *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) ("during the first four steps, the claimant has the burden of proof; this burden shifts to the Commissioner only at Step Five").  All criteria must also be met

concurrently for a period of twelve continuous months.  *See* 20 C.F.R. § 416.925(c)(3), (4); 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(D) ("[b]ecause abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation.").  Therefore, a claimant must show the presence of abnormal physical findings over time as "established by a record of ongoing management and evaluation." 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.00(D).  *See also Irvin v. Comm'r of Soc. Sec.*, No. 1:12-cv-837, 2013 WL 3353888, at *10 (S.D. Ohio July 3, 2013).  Occasional or intermittent abnormal examination findings are not sufficient to meet a listing.  *Id*. (citing *Bailey v. Comm'r of Soc. Sec.,* 413 F. App'x 853, 854 (6th Cir. 2011)).

Listing 1.04, which was in effect[4] at the time the ALJ issued her unfavorable determination, dealt with spinal disorders.  It provided:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> > A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); *or*
> >
> > B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; *or*

---

[4] The Commissioner revised the musculoskeletal Listings effective April 2, 2021, and the revised version applies to claims filed on or after that effective date or that are pending on that effective date.  Revised Medical Criteria for Evaluating Musculoskeletal Disorders, 85 Fed. Reg. 78164–01, 2020 WL 7056412 (Dec. 30, 2020).

> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 (emphasis added).

The ALJ determined that Plaintiff did not meet any part of Listing 1.04 (*i.e.*, 1.04A, 1.04B, or 1.04C.)  The ALJ wrote: "[t]he claimant's impairment does not meet Listing 1.04. There is no radiological evidence of nerve root compression; spinal arachnoiditis; or lumbar spinal stenosis resulting in pseudoclaudication . . . .  Additionally, the claimant is able to ambulate effectively . . . . "  (R. at 29.)

Plaintiff does not contend that the ALJ wrongly determined that the record contains no radiological evidence of nerve root compression— a prerequisite for finding that he met Listing 1.04A.  Indeed, Plaintiff agrees that the record contains no such evidence.  (ECF No. 13, PageID # 6943.)  Plaintiff instead asserts that the ALJ could not find that he did not meet Listing 1.04A unless the record contained affirmative evidence showing that he did not have nerve root compression.  (*Id.*)  But that is not the standard.  It is incumbent upon Plaintiff to point to record evidence showing that he does satisfy every element of a listing in order for an ALJ to find that he meets it.  *O'Brien*, 819 F. App'x 414–15 ("At step three, [claimant] bears the burden of demonstrating from medical evidence in the record that his impairments meet or exceed a relevant listing.")  Plaintiff acknowledges that the record contains no evidence of nerve root compression.  Nerve root compression is a mandatory element of Listing 1.04A.  Therefore, the ALJ did not err when determining that Plaintiff did not meet Listing 1.04A.

Plaintiff further asserts that the ALJ erred because she failed to determine if Plaintiff's impairments medically equaled Listing 1.04.  A claimant can be found disabled if his

11

impairments are medically equivalent to a listing. 20 C.F.R. §§ 404.1526, 416.926. To be medically equivalent to a listed impairment, an impairment must be "at least equal in severity and duration to the criteria of any listed impairment." *Id*. As noted, the burden of establishing medical equivalency is borne by the claimant. And that he can only meet that burden if he can "present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Bailey,* 413 F. App'x at 854 (6th Cir. 2011) (citing *Sullivan,* 493 U.S. at 531) (emphasis in original)); *Thacker v. Social Security Admin.,* 93 F. App'x 725, 728 (6th Cir. 2004) ("When a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency.") (citing *Evans v. Secretary of Health & Human Servs.,* 835 F.2d 161, 164 (6th Cir. 1987)).

Plaintiff specifically asserts that the ALJ "wholly failed to provide any analysis as to whether Plaintiff's impairments, or combination thereof, would medically equal the listing." (ECF No. 13, PageID # 6944–45.) Plaintiff is mistaken. The ALJ explicitly indicated that Plaintiff did not have an impairment that "meets or *medically equals* the severity of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 . . . ." (R. at 28.) (emphasis added). Moreover, the ALJ explicitly indicated that no medical source had opined that his impairments were equal to a listing. The ALJ wrote: " . . . no acceptable medical source has rendered an opinion that the medical findings are equivalent in severity to the criteria of *any* listed impairment, individually or in combination." (R. at 28.) (emphasis added). Substantial evidence supports that analysis. The state agency reviewers reviewed Plaintiff's file initially and at reconsideration. Although they only noted that they specifically considered Listing 1.02, neither

of them found that Plaintiff's impairments met or equaled any listed impairment.  (R. at 89, 98,
112, 127.)  Notably, "[a]n ALJ is permitted, even encouraged to rely on a medical expert for a
professional medical analysis of whether, on a complicated record, a claimant meets or equals a
listing." *Jones v. Comm'r of Soc. Sec.*, No. 5:10-cv-2621, 2012 WL 946997, at *8 (N.D. Ohio
Mar. 20, 2012).

Even if the ALJ's finding on medical equivalence lacked adequate support, the Sixth
Circuit has found that such error was harmless where the plaintiff fails to show that his
impairments meet or medically equal a listing.  *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x
359, 366 (6th Cir. 2014).  Plaintiff insists that he does.  In support, he points to record evidence
showing that he experienced tenderness, muscle weakness, sensory and reflex loss, and positive
straight leg tests.  (ECF No. 13, PageID # 6944.)  But as the Commissioner correctly notes,
tenderness is not an element of Listing 1.04A— neuroanatomical distribution of pain is.  Plaintiff
does not point to record evidence of that.

Indeed, the record reflects that Plaintiff did not complain of back pain until well after his
alleged date of onset, and then he reported that his pain was improved with medications.  The
record demonstrates that Plaintiff denied back pain in June, September, and November 2018.  (R.
at 1060, 1055, 1051.)  On March 4, 2019, Plaintiff reported that he had ongoing leg pain, but no
other areas of pain.  (R. at 1035.)  Plaintiff denied back pain again on April 16, 2019.  (R. at
1047.)  During a functional capacity evaluation in May 2019, Plaintiff reported that he had pain
only in the left ankle and leg during testing.  (R. at 1080.)  It appears that Plaintiff did not seek
treatment for back pain until October 27, 2019, almost two years after his alleged date of onset.
(R. at 1271.)  At that time, an emergency room examination found that he had diffuse pain over
the left paralumbar area, that his left buttock was tender to palpitation, and that he had pain with

13

straight leg raising on the left side. (R. at 1273.) A CT scan of Plaintiff's lumbar spine found bilateral spondylolisthesis of the L5 with bulges at L4–L5 and L5–S1. (R. at 1274, 1276–78.) He was prescribed valium, hydromorphone, and prednisone. (R. at 1211.) On November 4, 2019, Plaintiff again denied back pain. (R. at 1297.) On December 2, 2019, Plaintiff reported that he had developed left to mid lumbosacral discomfort beginning in October 2019, when he experienced intermittent pain to the post lateral hip and lateral thigh and calf with sitting, standing, and walking. (R. at 1684.) Although Plaintiff reported intermittent back pain at that time, he denied any radicular symptoms, and reported that his symptoms had improved significantly with prednisone. (*Id*.) On January 31, 2020, Plaintiff again reported intermittent back pain, but he denied radicular symptoms. (R. at 1679.) On March 31, 2020, Plaintiff denied having any back or radicular pain. (R. at 1674.) Plaintiff subsequently reported intermittent back pain without radicular symptoms, but he again confirmed that his symptoms improved significantly with prednisone. (R. at 1669, 6697, 12, 7.)

The Commissioner also notes that Plaintiff has failed to point to record evidence of "limitation of the motion of the spine," another mandatory element of Listing 1.04A. The Court has been unable to locate any after independent review. And although Plaintiff points to examinations on January 9, and March 15, 2018, finding that his hamstring straight-leg raises were limited on the left and right (R. at 560, 569, 632, 641), and that he had pain with straight leg raising on the left side on October 27, 2019 (R. at 1273), the records do not indicate if those tests were done in the sitting or supine positions. A claimant, however, must point to evidence of positive straight leg-raising tests in both positions to meet Listing 1.04A. Therefore, these examination results do not demonstrate that he satisfies this mandatory element of Listing 1.04A. *Asbury v. Comm'r of Soc. Sec.*, No. 1:18–cv–365, 2019 WL 3916479, at *10 (S.D. Ohio Aug.

14

20, 2019), (finding plaintiff could not meet Listing 1.04A where there was "no indication" if straight leg raising tests were positive for both the supine and sitting positions as Listing 1.04A requires"), *report and recommendation affirmed*, No. 1:18–cv–365, 2019 WL 4452677, (S.D. Ohio September 17, 2019); *Miller v. Comm'r of Soc. Sec.*, No. 1:10–cv–122778, 848 F. Supp. 2d 694, 710 (E.D. Mich. Oct. 21, 2011) (finding the plaintiff could not meet Listing 1.04A where she did not point to "positive straight leg tests in both the sitting and supine positions").

In support of his step three allegations of error, Plaintiff also relies on the Sixth Circuit Court of Appeals' opinion in *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415–16 (6th Cir. 2011). There, an ALJ found that a claimant had severe mental *and* physical impairments at step two, but then only analyzed if the claimant's mental impairments met or equaled a listing and failed to analyze if the claimant's physical impairments did so. *Id*. In this case, however, the ALJ explicitly indicated that he considered all of the listings, paid "particular attention to listings 1.02, 1.03, 1.04, 1.06, 1.08, and 8.04," and specifically discussed why Plaintiff did not meet Listing 1.04. (R. 28, 29.) In short, the ALJ in this case, unlike the ALJ in *Reynolds*, did not skip a step in the disability determination process.

Accordingly, the Court does not find that the ALJ committed reversible error when performing her listing analysis at step three. Plaintiff's first allegation of error is not well taken.

**B.    The ALJ did not err when evaluating Dr. Scharschmidt's medical opinion.**

Plaintiff contends that the ALJ erred when evaluating Dr. Scharschmidt's medical opinion. Specifically, Plaintiff contends that the ALJ erred by failing to incorporate into his RFC a limitation opined by Dr. Scharschmidt— that Plaintiff needed to elevate his leg every two-to-three hours. This contention of error also lacks merit.

A claimant's RFC is an assessment of "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1) (2012). A claimant's RFC assessment must be based on

all the relevant evidence in a his or her case file. *Id*. The governing regulations[5] describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings. 20 C.F.R. §§ 404.1513(a)(1)-(5); 416.913(a)(1)–(5). With regard to two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a); 416.920c(a). Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the claimant"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability program s policies and evidentiary requirements." §§ 404.1520c(c)(1)–(5); 416.920c(c)(1)–(5). Although there are five factors, supportability and consistency are the most important, and the ALJ must explain how they were considered. §§ 404.1520c(b)(2); 416.920c(b)(2). And although an ALJ may discuss how he or she evaluated the other factors, he or she is not generally required to do so. *Id*. If, however, an ALJ "find[s] that two or more medical opinions . . . about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same, [the ALJ must] articulate how [he or she] considered the other most persuasive factors . . . . . " §§ 404.1520c(b)(3); 416.920c(b)(3).

---

[5] Plaintiff's application was filed after March 27, 2017. Therefore, it is governed by revised regulations redefining how evidence is categorized and evaluated when an RFC is assessed. *See* 20 C.F.R. §§ 404.1513(a), 404.1520c, 416.913(a), 416.920c (2017).

In addition, when a medical source provides multiple opinions, the ALJ need not articulate how he or she evaluated each medical opinion individually.  §§ 404.1520c(b)(1); 416.920c(b)(1).  Instead, the ALJ must "articulate how [he or she] considered the medical opinions  . . . from that medical source together in a single analysis using the factors listed [above], as appropriate."  *Id.*

In this case, the ALJ acknowledged that Dr. Scharschmidt opined that Plaintiff would need to elevate his foot every two-to-three hours due to chronic pain and swelling.  (R. at 35.)  The ALJ analyzed that opinion and determined that it was not "particularly persuasive."  (*Id.*)  The ALJ explained her reasons for that determination as follows:

> Thomas Scharschmidt, M.D., opined that the claimant needed to elevate his foot every 2-3 hours due to chronic pain and swelling (Exhibit 10F/2).  The undersigned finds this opinion is not particularly persuasive in light of the objective findings and course of treatment.  His physical examinations documented no ongoing left ankle swelling.  His own examinations do not show that he actually advised the claimant to elevate his foot.  He reviewed the history and physical examination, but the November 2019 examination by Dr. Walla, who did prescribed [*sic*] a cane and advise elevation of the foot "every couple hours," did not show any edema in the lower extremity.  Also, the claimant's wound that had been of such concern starting in July 2019 had healed completely.  Even with the new wounds for which he began treatment in April 2020, the exams failed to document edema in the lower extremities. (Exhibits 16F, 28F, 29F)  Indeed, when he was seen in July and September 2020 at OSU Wexner, the exams failed to show any sign of edema in the lower extremities.  Thus, I do not find the claimant requires the additional functional limitation of elevation of the foot/leg while working.

(R. at 35–36.)

As this discussion above demonstrates, the ALJ determined that Dr. Scharschmidt's opined elevation limitation was not persuasive for several reasons.  First, the ALJ found that Dr. Scharschmidt's November 4, 2019 opinion was not supported by his own treatment records because his examinations failed to find ongoing ankle swelling.  (R. at 35.)  That accurately

reflects the record. Dr. Scharschmidt's records do not contain examination notes indicating that Plaintiff's ankle was swollen.

The ALJ also determined that Dr. Scharschmidt's opinion was not supported by the record because he never advised Plaintiff to elevate his foot. (R. at 35.) That also accurately describes the record which is bereft of any documentation reflecting that Dr. Scharschmidt ever offered Plaintiff advice to that effect. Moreover, Dr. Scharschmidt indicated in his November 4, 2019 opinion that he had reviewed treatment notes from Dr. Walla, who had prescribed a cane for Plaintiff and advised him to elevate his foot "every couple of hours when he [was] upright at work." But Dr. Walla's November 4, 2019 treatment notes do not indicate that his examination found that Plaintiff had swelling that day. In fact, Dr. Walla wrote that he found no erythema or edema during his November 4, 2019 examination of Plaintiff. (R. at 1298.)

The ALJ also determined that Dr. Scharschmidt's opined elevation restriction was inconsistent with other record evidence, including evidence that he had no edema in his lower extremities despite seeking treatment for lower left leg wounds that developed on two occasions. That determination enjoys substantial record support. Providers routinely found that Plaintiff's ankle and calf had no erythema (R. at 753, 849, 853, 878, 892, 906, 921, 938, 953, 971, 1300, 1273, 1298, 1666, 6856) or edema (1060, 1052, 1048, 1273, 6847, 6825, 6800). In addition, providers routinely found that Plaintiff had no swelling in his ankle or calf. (R. at 753, 849, 853, 878, 892, 906, 921, 939, 953, 971, 1303, 1301.)

Elsewhere in the determination, the ALJ elaborated on why she declined to incorporate the opined elevation limitation into Plaintiff's RFC. The ALJ wrote:

> The undersigned notes that given the lack of findings of edema on examination and his work doing flooring and cleaning part-time, there is no support for a need to elevate his legs. And, if he needed to elevate them, at most this was only every two or three hours per his doctor, and this can clearly be done during normal breaks at

> work. His work in 2019 and 2020 for a cleaning company was part-time but
> apparently well over sedentary. He testified that all he did was empty trash cans
> and sweep the floors, but he was clearly on his feet during the day for work.

(R. at 35.) As this discussion demonstrates, the ALJ determined that the opined elevation

limitation was undermined by Plaintiff's ability to continue working after December 14, 2017,

his alleged date of onset. Plaintiff's ability to maintain part-time employment after that date was

a permissible consideration. *Miller v. Comm'r Soc. Sec.*, 524 F. App'x. 191, 194 (6th Cir. 2013)

("[T]he ALJ did not err by considering [the claimant's] ability to maintain part-time employment

as one factor relevant to the determination of whether he was disabled."); *see also* 20 C.F.R. §

404.1571 (the ability to perform work at less than substantial gainful activity level "may show

that you are able to do more work than you actually did").

Moreover, substantial evidence supports the ALJ's determination—the record reflects

that Plaintiff worked after December 14, 2017. For instance, on March 29, 2018, Plaintiff

shortened a PT session because of his work schedule. (R. at 686.) On April 19, 2018, Plaintiff

reported to a provider that he was working about three days a week (24–32 hours) doing

flooring. (R. at 751.) Although he indicated that it was too difficult for him to do actual floor

installations, he was doing things like loading materials and carpets on carts. (*Id*.) He further

indicated that his gabapentin made him feel foggy and for that reason he could not take it while

he operated a floor machine. (*Id*.) He later explained that the floor machine he operated at that

time may have been a floor buffer. (R. at 58.) On June 14, 2018, he reported that it was hard to

work, but that he was still working at a flooring job. (R. at 847.) On July 19, and August 16,

2018, he reported that he was working as much as he was able with his pain, doing flooring for

about 20 hours a week. (R. at 862, 876.) On October 11, 2018, he reported that he was working

a couple days a week helping with flooring— mainly moving materials instead of helping with

actual installation.  (R. at 904.)  On November 8, 2018, he indicated that he was working 15–20 hours a week, which was what he could tolerate.  (R. at 919.)  On December 6, 2018, he reported working 25 hours a week doing flooring.  (R. at 936.)  On January 10, 2019, he indicated that he was working around 15 hours a week doing flooring.  (R. at 952.)  He also reported that he took care of his children on weekends and watched his girlfriend's children during the week, which included going to the mall, and reported that he was active with doing that.  (R. at 952.)  On February 7, 2019, he again reported working two-to-three days a week doing flooring.  (R. at 969.)  Earnings documents reflect that Plaintiff also worked in 2019 and part of 2020 for I&M Cleaning Company doing general cleaning, which included sweeping floors and emptying trash cans.  (R. at 61–62.)  He testified that he did this work while using a cane.  (R. at 62.)

Accordingly, the Court finds that the ALJ did not commit reversible error when analyzing Dr. Scharschmidt's opinion and declining to incorporate his elevation limitation into Plaintiff's RFC.  Plaintiff's second allegation of error is not well taken.

## VI.    CONCLUSION

For all the foregoing reasons, the Court finds that Plaintiff's allegations of error are not well taken.  Accordingly, Plaintiff's Statement of Errors is **OVERRULED**, and the Commissioner's non-disability determination is **AFFIRMED**.

**IT IS SO ORDERED.**

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE